The next case today is Anoush Cab, Inc. v. Uber Technologies, Inc. Appeal Number 19-2001. Ms. Blauner, you may begin when you're ready. Good morning, Chief Judge Howard. If I can reserve three minutes for rebuttal, I would be pleased to ask for that. Yes. Thank you. Thank you very much. Good morning. Michelle Blauner for the Appellant Taxi Owners. The district court in this case found that Uber violated the clear terms of Boston's vehicle-for-hire laws, which prohibited private vehicles from picking up passengers-for-hire without proper licensing. The judgment, if affirmed, would create a dangerous precedent. It would allow Uber to violate a clear statutory scheme without consequence based on statements of government officials who had no actual or apparent authority to excuse Uber's noncompliance with those laws. In fact, the court held that no government official with statutory authority gave Uber affirmative permission to operate. There's extensive briefing in this case, so in this argument I'd like to focus on three points of legal error. First, Boston's vehicle-for-hire laws were intended to protect licensed taxi operators from unlicensed competition. By violating those laws, Uber engaged in unfair competition under Massachusetts common law. It was legal error for the court to add an egregiousness requirement to plaintiff's common law claim. Second, Uber violated Chapter 93A because under established FTC standards, which guide court decisions under Chapter 93A, Uber's violations of the law, which the court found gave Uber advantages in cost and pricing that licensed taxi operators could not lawfully match, are unfair methods of competition. And finally, based upon the court's own factual findings about plaintiff's loss of medallion values and reductions in ridership and In ruling that the plaintiffs did not prove damages with reasonable certainty, the court applied an inapplicable federal securities law standard and wrongly placed the burden on plaintiffs to disaggregate losses caused by Uber from losses caused by other factors. Under Massachusetts law established by the SJC, Uber had the burden to disaggregate damages. On both liability and damages, Uber asked this court to disregard and rewrite Massachusetts law. So I'd now like to turn to my first point regarding the common law claim. The district court's conclusion that Uber was not liable for common law unfair competition was based on its application of the wrong legal standard under Massachusetts law. Nothing in the Massachusetts common law of unfair competition required plaintiffs to prove that Uber acted egregiously or permitted consideration of Uber's good faith as the district court held. Uber does not even attempt to defend the court's decision on the grounds that it applied the correct legal standard. The applicable Massachusetts law is set forth in SJC's decision in Mass. Society of Optometry v. Waddock, which adopted the standard set forth in the Restatement First of Torts, Section 710, but though that provision is still applicable under the current restatement of unfair competition. Under Waddock, Uber engaged in unfair competition because it violated a legislative enactment which prohibited it from business and one of the purposes of the vehicle for hire laws was to protect the licensed medallion owners from unlicensed competition and the Massachusetts statutory scheme does not negate liability. Both elements were satisfied here. Under the first element, this is disposed of by the SJC's decision in Town Taxi v. Police Commissioner of the City of Boston. In that case, the SJC held that the Boston vehicle for hire industry was a statutorily created and regulated monopoly and that exclusive rights were given under the existing provisions and that one of the purposes of the statutory limitation on the number of licensed vehicles was to limit destructive competition. Throughout this case, there was a statutory... Counsel, I'm a little unclear about that statement. Wasn't there an articulation that the purpose of the statute was for public health reasons? Your Honor, under the law, it has to just have one purpose being the protection of that could have multiple purposes and so the fact that the statute also had public safety and health purposes does not mean that it didn't also have purposes of protecting competition. There would be absolutely no reason to impose a statutory cap on the number of a purpose of protecting licensed taxi owners from competition and the fact that the SJC in the Town Taxi case expressly held that this industry during the period of time at issue in this case was a licensed... That was a statutorily created and regulated monopoly is evidence that the Supreme Judicial Court recognized that this industry was given exclusive rights and so the fact that there was a secondary or a concurrent purpose of public safety is irrelevant under the standard set forth in the restatement and set forth in WADC. So, if I may continue. In addition to showing the first element of WADC, we also show the second element. The statute does not negate liability. Nothing in the laws negates liability and there's a long line of SJC authority that has allowed licensed competitors to sue unlicensed competitors for unfair competition in the transportation industry. The Deister case that we cite and a number of the other railroad cases that we cite in our briefs support that position. And in the Deister case, the fact that the operation of buses without proper licenses was a misdemeanor did not preclude the relief sought. In addition, since the WADC case, the SJC has expressly held in the Hirshenau case and the O'Shaughnessy case at 98 Mass. App. Court 716 has held that the fact that a statute provides for civil fines and public enforcement does not mean that private relief is not available. So, it is our view that in this case, we have established all the elements that are necessary for unfair competition. And the district court ignored Massachusetts law and what it did here is it held that we had to prove egregiousness and Uber's good faith was relevant to the common law claim when in fact there is no legal support for that argument and Uber does not claim to argue that there is legal support for that argument. If I could go back to Judge Katzmann's question and relate it to WADC, I thought WADC held that in that particular case, that protecting against competition or granting a monopoly was not the purpose of the statute despite what the restatement may have said. So, can it be said that you're extending WADC a little beyond what it stands for? No, WADC was a very different case. WADC, there was no monopoly ever granted by state statutes. WADC did not have any statutory limit on the number of licensed optometrists. Anyone in the state could get a licensed optometry license as long as they met the standards. In our case, there were the number of licensed competitors and if you go back to the origination of this statutory license, the Senate report that preceded the imposition of the statutory caps expressly stated that the purpose of it was to eliminate destructive competition in the taxi industry. So, this case is very different than WADC because WADC, there was never a statutory cap. Anyone who met the, just like as a lawyer, anyone who went to law school and took the bar exam and, you know, could become a lawyer. There's no limit in Massachusetts as to how many lawyers can practice in Massachusetts. Anyone who meets the standards can do so. Same in WADC. Anyone who met the standards for optometry could get an optometry license. And another question on your common law unfair competition claim. I thought that there was a requirement in the common law that there be consumer confusion or the likelihood of consumer The common law unfair competition claim is equivalent to the statutory claim, but that does not seem to be supported by the case law. So, the case law on consumer confusion, that's a misstatement of the case law. The district courts did correctly hold the law. The consumer confusion is not an element of this type of unfair competition claims. There are many different types of unfair competition claims. Some could be based on common law. Yes, there are many types. You can look at the restatement of unfair competition and a list of a half dozen different types of unfair competition claims that are available at common law. Some of them are based on palming off. Some could be based on trademark infringement, patent infringement. So, there are a lot of different types of unfair competition claims at common law. And the consumer confusion claims are only one type of it. And I want to point out that if you look at the two cases that Uber cites on this consumer confusion concept, one is Datacom and the other is Planned Parenthood. Those are the two SJC cases. And what the court said in Datacom is that consumer confusion was a required element of the type of claim that was being brought in that case, which was a palming off claim. There is no broad language in that case that consumer confusion is required of every type of common law unfair competition claim. Same thing in Planned Parenthood. Uber cites a footnote in this dissent that says that palming off is the essence of unfair competition. But if you read that footnote to the end, it also says that palming off is just the most common type of unfair competition claim. So, consumer confusion is a relevant standard in certain types of unfair competition claims, but not in the one that we're talking here. Wattock doesn't suggest that consumer confusion is part of this claim. The restatement in 710 doesn't suggest that consumer confusion would be part of the claim. The restatement of unfair competition, the third, which is the current version of the restatement in section one, does not say that consumer confusion is part of a common law claim, which is based on a statutory violation of a licensing scheme designed to certain competitors. So, counsel, in sum, when you compare the common law claim versus 93A, from the perspective of your client, which is the easier claim to prove? I think I would say that they are different in the following respect. Our view is that required of the common law claim. Our view is that it's also not required of the 93A claim, though there certainly is at least some support for some types of 93A claims for an egregiousness requirement. There's absolutely no support for an egregiousness requirement under the common law. But the claims are somewhat different because under the common law claim, we have to show that the statute was designed to protect us from competition. Under the 93A claim, under the unfair methods of competition piece and the standards set forth by the FTC, that's the right agency, what we have to show is that there is a violation of a statute and the violation of the that it was able to, and in fact, the court found here, did exploit. So, I mean, a mere violation of the statute, I don't mean to suggest any sort of gloss on the word mere, but the case law says violation of a statute in and of itself does not suffice to we're not alleging and we didn't prove just a mere violation of the statute. The SJC in the Dracopoulos case said a violation of the statute is a violation of 93A if it is also an unfair method of competition. And under the standards set forth by the FTC, the reason that the violation of the statute in this case is an unfair method of competition is because the court found at paragraphs 39 through 42 of its findings of fact that Uber exploited those violations to get economic costs and pricing advantages which were not available to legally complying competitors like my client. And those advantages in pricing enabled Uber to nearly half the price of the service. Their failure to abide by the limits let them put thousands and thousands of cars on the street and they were able to avoid costs of the licensing system that saved their drivers over $26,000 a year. So in that circumstance, we're not saying that just the violation alone is the 93A violation. But based on the standard that was first established by the Supreme Court in the Capple case, we've cited cases in other jurisdictions where courts have held the same like if you have a competitor who doesn't abide by tip laws or gets advantages over its competitors of those, those are considered under the law to be unfair methods of competition. I know we didn't in the time allotted which we've gone considerably over get to your third argument, but let me ask the court whether there are follow-up questions at this point in time. No. All right. And you've reserved some time, counsel. So we'll hear from you. Thank you, Your Honor. I want to respond to a number of arguments brought up by my sister. In particular, I'd like to address unfair methods of competition, the Waddick case and Section 710, this issue of consumer confusion. But before I get into that, I just want to make the point that if you look at the findings of fact and conclusions of law, other than a slight mention of Restatement 710 and the railroad cases, appellants in this case did not distinguish the standard that applies to the common law claims that they are now arguing on appeal and that they throughout applied the egregiousness standard and argued, in fact, that Uber's conduct was unlawful. Ms. Blauner, this is my fault. Would you be able to mute your video? Thank you. Ms. Dunn. Thank you. So just to be clear about what appellants are arguing for when they're talking about the common law, they are arguing that the taxi rules grant medallion holders a right to sue for damages and exclude new market entrants that were never contemplated by the rule that they invoke. And that all that happens in the taxi rules without the taxi rules ever saying so. So Restatement 710 and the Waddick case do not stand for this. And in fact, Mr. Chief Judge, I just want you to know I can no longer see you or Judge Thompson, but I do see Judge Katzman. All right. Let's just go off the record here for a minute if we can. Mr. Clerk. Yeah. Hi, Judge. Thank you. What I'd ask you to do, well, we could do one of two things. We could actually remove her from the meeting and have her come back. And that actually has resolved this issue for a few other attorneys today. Well, why don't we try that and hope for the best? Okay. Thank you very much, Judge. So, Attorney Dunn, I'm actually going to remove you from the meeting and I'd like you to rejoin it immediately and we'll let you in from that lobby like you did earlier today. Okay. All right. Thank you. Sorry about that, Judge. I hope it fixes itself presently. The recording is paused. Thank you. Okay. She's in our lobby. We're going to try and bring her right in. Attorney Dunn, can you see the judges? Yes, I can. Okay. All right. If you can find your place, you may proceed. I can, Your Honor. Thank you very much. Your Honor, just before I start, would you like me to go back to the beginning? The only point I had really made earlier was that the egregiousness requirement was applied by appellants to all of their claims, but for a mention of Restatement 710 and the railroad cases and their findings of fact and conclusions of law had not been pressed before the district court. But then I was going to go on to discuss in particular the arguments made about the common law claim before the court. Yes. May I do so? Yes. Thank you. Okay. What appellants are arguing with regard to the taxi rules is that the taxi rules... I'm sorry. Before you get cranked up, you had also mentioned that they're trying to apply the laws that are clearly inapplicable to your clients. And I'm trying to figure out why you don't think Uber falls within at least the definition of the Boston City Ordinance. There was no finding by the district court either way that we fall within the City Ordinance after the district court had heard the evidence at trial. So a very important piece of evidence at trial that came in through the testimony of Captain Ciccolo, who wrote the taxi rules, is that the taxi rules had never been applied to any sort of prearranged ride. Uber offers... The product at issue in this case is a prearranged ride as opposed to what a taxi offers, which is street hails. And so Captain Ciccolo's testimony, which is credited by the district court and in the record... That's not all that taxis do. People can call for a taxi and have them pick them up at their house. People take taxis from their homes to the airport all the time. That's correct. And there's an express exception in the taxi rules. If you are outside the city of Boston or you're driving through the city of Boston and it's a prearranged ride, you can pick up the passenger. And the reason Captain Ciccolo explained to the court and the other police department witnesses corroborated this is because a prearranged ride is a public danger when two strangers meet in a car to exchange cash. And so the weight of the testimony from all the law enforcement witnesses that testified was that these rules had not been applied to prearranged rides. And in fact, this was the city's position when the taxi industry moved for an injunction in 2015, the city of Boston filed a brief with the court that said, we welcome Uber and other ride sharing companies because they offer a new diverse method of competition and options for consumers that lower prices and have greater availability. So the concern was the issue of having a street hail where you pick up a stranger on the street and take them into your car. And this was the district court presided over trial and saw the evidence that the city not only allowed Uber to operate, but really welcomed Uber into the city. Because as the district court noted, at the same time that ride sharing was coming on the scene, there was an expose by the Boston Globe accusing the taxi industry and in particular the appellants of defrauding consumers and drivers. And there was a huge effort on behalf of the city to welcome these new market entrants onto the scene. And so the district court found at least 10 pieces of evidence about Uber's conduct that showed that the city was welcoming Uber. There were emails that said just launch. There were letters where Uber said, please let us know if you ever change your policy of non-enforcement. The mayor went on the radio to say, you can't be ticketed under the taxi rules if you're an Uber. The governor put out repeated press releases that said Uber can continue operating in the Commonwealth. Uber partnered with the city in a contract of a data sharing agreement. And ultimately at the time that the MassDOT regulations were passed in 2015, the city even put in public legal filings. It's welcoming Uber and the reasons that it welcomed Uber, which specifically go to some of the things that Ms. Glauner mentioned, which is the diversity of options for consumers, lower prices and greater availability. The district court's decision in lack of enforcement impact the clear wording of, once again, I'll just stick with the city ordinance. You say witnesses testified that they didn't enforce it that way, but do we take that to mean it doesn't say what it says? No, your honor. But as the district court found, a violation of a licensing regulation would not be sufficient in itself to rise to the level of 93A. So for 93A, courts look at all the circumstances. They specifically look at circumstances that, as the First Circuit said, grow and change over time. And they're looking for conduct that rise to a level of egregiousness or in the First Circuit's words, raise an eyebrow to those inured to the rough and tumble of commerce. That's a quote from the Massachusetts Appeals Court, which I was sad to see by Judge Cass has been basically rejected more recently. And Judge Lynch for the First Circuit said that that language was not instructive. Well, I love that quote, but it's no longer actually the appropriate language. Well, I believe your honor is talking about the rascality requirement. But if the court were to look at Baker, a recent First Circuit case, Walsh, Inree, TJX, all of those First Circuit decisions reaffirm the egregiousness requirement. And this idea that there's something more that is required than violation of a licensing statute. Right. I don't disagree with that. Yes, I agree on egregiousness. Yeah. Thank you, your honor. But it's very important that I... That's only with respect to business to business claims under section 11, right? Yes, your honor. And this is a section 11... I know that's what we're talking about here. I just want to make sure. Okay. Yes. But let me return to the common law claim, because there are a number of things that I feel must be corrected. So to begin with, if you look at the Waddick case, the Waddick case is very clear that a right to restrain competition must be specifically granted. And it gives us an example that we would commend to the court of a statute that did grant specifically such a right. It is GL 93, section 14H. And what that section says is it specifically gives a party to go into court to sue over a right to exclude a competitor. And there is no such thing that appears in the taxi regulations. And there's no such thing that appears in the 1930 report by the Special Commission of Licensing of Taxicab Stands, which is the only basis that appellants put forward to say that they have a right to exclude competition. So to be clear, a licensing statute does say a certain set of businesses can be licensed or individuals. But what the court in Waddick is talking about is the right to have a private right of action to sue to exclude a new market entrant. And it would be particularly absurd if there were a right in the taxi rules to exclude a future new market entrant that didn't exist at the time that the rules were written and to whom the kind of service they provide was never applied, prearranged rides under the taxi rules. So if you look at that 1930 Special Commission on Licensing report, and appellants did not file the entire thing with the court, we did that. That had to do with the problem of taxi stands. And so did the limitation on the number of medallions. So if the court were to look at the case Town Taxi that Ms. Blauner cited, when they are talking about destructive competition, what they are talking about is that landowners would give certain permissions to, would go to the commissioner for certain permissions to occupy certain excellently placed taxi stands in the market. And that was creating problems with regard to the taxi stands. And so the reason that the limitation on medallions were placed was not so taxi owners could then have a private right of action to exclude any competition from the market, far from it. It was because there was problems of taxis competing with each other to get to these gem taxi stands. And that's what Town Taxi says. And that's what also says. And incidentally, that's not a legislative act. That is a report by a commission that was constituted to deal with this taxi stand problem. What is the point of the cap on the medallions? Right. The point of the cap on the medallions was to limit the number of taxis vying with each other to have access to the taxi stands. That is what Town Taxi says. And that's what this report says. But it was not to it was not to give the taxis a private right of action to sue new market competitors that come into the market. And incidentally, even if it was to create a market of taxis, a monopoly of taxis, it still would not mean for private industry to be able to sue competitors that come into the market. And we would commend to the court the Third Circuit's decision, Judge Rendell's decision in Philadelphia Taxi and the Seventh Circuit's decision in Illinois Trans Trade Association, where they also look at taxi rules. And Judge Posner goes into this in great depth and says, no, the the point of getting a medallion is that you have a medallion which entitles you a right to drive under that medallion, but not to exclude new market entrants. The second purpose of these rules, which goes directly to the inapplicable inapplicability of 710, is that those are licenses, as Judge Judge Katzman raised, that were put there for public convenience and necessity. And that language comes directly from Town Taxi. And 710, as this court knows, does not apply to licenses for fiscal or police purposes. So the the taxi rules are regulated by the Boston Police Department. They're, the goes all the way up the chain through the police commissioners to the mayor who said that those rules were not supposed to apply to Uber. These are rules there for public convenience and necessity. I want to make sure I also apologize, Judge Katzman. Quick question. I'm sorry. Your sister began essentially with the statement that the decision of the district court turns our system of laws on its head, establishing a dangerous precedent that government officials can permit violations of democratically enacted unambiguous laws and commercial actors can violate those laws in reliance on such permission. You've been responding to that, but I was wondering if you could just in two sentences respond. Your Honor, that was never our argument. And the district court was very expressed that it did not rely on any statements of government officials for a supposed good faith defense. The point of looking at what the government officials told Uber and what Uber knew and what Uber said to government officials is to look at the commercial marketplace, which is the applicable standard under 93A. The first circuit has also said that you look at what both parties knew or should have known. And so part of what Uber knew came from this constant flow of information it was receiving from the individuals charged with deciding whether or not to apply the taxi rules and the individuals that were very publicly in statements to Uber and to the market welcoming Uber into the market. I also would very much like to address the point Ms. Glauner made about unfair method of competition. And just to be completely clear, below and to the district court, the appellants consistently argued the term unfair generally. They did not parse out unfair methods of competition from unfair acts and practices. And the court could look at the findings of fact, paragraph 316, to find an example of that. Now they're on appeal and they want a separate standard to apply because they don't want the egregiousness standard to apply and the 710 under the restatement and WADEC do not support their position. So now they're talking about rely upon, and specifically I'm speaking here about Catton and the Massachusetts School of Law case, specifically say that appellants must have proven anti-competitive effects. And anti-competitive effects under the law of competition is a very specific thing. It has to be injury to the market and injury to consumers and competition. It is not injury to a competitor. And so to the extent that they talk about cost and pricing advantages and availability, that is not injury to the market. In fact, that is the kind of competition that is encouraged, and Judge Posner and Judge Rendell both make these points at great length, which is lower cost and greater availability from a new market entrant. It's something that is encouraged under the law of competition. But in any event, that is not something that the appellants in this case tried to prove. And in fact, in their findings of fact, footnote nine, they expressly say that they don't need to prove anti-competitive effects. They didn't put on any market expert. The only market expert was our expert and his testimony was undisputed. So I just want to make sure that I clear that up. But that was not an argument made below in this case. So it's waived? It's waived? Yes, it is waived. And in any event, even if it were not waived, there was no evidence put on with regard to this. And in fact, plaintiffs consistently argued for an entirely other standard, the standard of egregiousness. So on that topic, with regard to 93A, Judge Thompson asked a number of questions about application of the taxi rules. I just want to be very clear that even if there were a violation of the taxi rules, that would not be sufficient to constitute a 93A violation. And the First Circuit has said that, the Massachusetts Supreme Judicial Court has said that. And in particular, there are cases that deal with the circumstance of regulatory ambiguity. So in this case, Uber had come into the market, it had asked for the position of the city. And the city had said, you know, just launch, there were, you know, regulatory signals that we go through in our brief at great length and that the district court cites to show how greatly Uber was welcomed into the market. But the cases that we cite that I would commend to the court are the Bowman case. And in particular, the Cablevision case in the First Circuit. So the Cablevision case bears some discussion. So you're going to need to wrap up, we've given you extra time. Okay, I appreciate that, Your Honor. May I finish the description of the Cablevision case? Depends how long you go. How about 20 seconds? Okay. Okay. So in Cablevision, what Boston Edison said to the Public Improvement Commission was, we're going to use fiber optic cables under the city. And the Public Improvement Commission said to Boston Edison, I don't think there's a rule about that. I'm not sure you can proceed at your own risk. And later, the law changed and this conduct was sanctioned. And even based on that, which is far less than Uber understood from the city in this case, even in that case, in that atmosphere of regulatory ambiguity, there was found to be no 93A violation. And in fact, even just this direction of proceeding your own risk was the court said might even constitute affirmative permission. So here, the district court found, you know, upwards of 10 relevant facts encouraging Uber to be in the market, that they wanted Uber in the market. They thought it would diversify competition and optionality for consumers and benefit consumers at a time when the taxi industry was not living up to its bargain. Are there additional questions from the court? No. All right. Thank you, Ms. Dunn. And we'll hear from Ms. Blauner again. Can you see me? Yes, indeed. I just saw that Judge Thompson left. Should I wait? I didn't go. I'm just letting the cats out. Should I wait till she sits down or? Yes. Okay. Thank you. Cats take precedence on this court. I understand it.  Now, that's something you don't see every day, right, counsel? That's true. You should have seen the instructions I gave to my sons today, this morning. Don't get upstairs near me. Anyway. All right. You have reserved three minutes for rebuttal. Thank you. I just want to respond to a number of points Ms. Dunn made. One is we absolutely did argue that egregiousness did not apply. It is in paragraph to the common law claim. It's in our brief, but I can't find the paragraph right now, so I apologize. But we absolutely argued that egregiousness, bad faith did not apply to the common law claim. Two, I'd like to point out that the judge did find that there was a violation of the Boston ordinance after trial that is in conclusion of law number two. As Judge Thompson pointed out, and the judge expressly stated prior to trial, the terms of the Boston ordinance were absolutely clear on its face that there was no good faith interpretation of that ordinance that allowed Uber to complete. There is no exceptions in the reason they didn't enforce against prearranged rides was because of resource allocation issues, and he expressly said that the language was broad. With respect to the Senate commission report, I want to point out that it was not just limited to taxi stands. The conclusion of the report was the commission believes there should be established a maximum number of taxi cabs to be reasonable and destructive competition. There's no question that that was one of the purposes of the statutory cap. As I said, there would be no other purpose of it. Town Taxi also talks about how it is a regulated monopoly. This was a statutorily created and of competition. The fact of the matter is Uber had to operate within the law. Massachusetts law is very clear on this point. No city or state official had the power to exempt Uber from complying with the regulation laws. We cite the Back Bay Cultural Association case and several others, and Uber could not rely as a matter of law on statements of government officials acting contrary to law, the D'Agostino case. There's nothing in the statute that allowed them to operate, and there is nothing in the law that allowed them to operate. The fact of the matter is Uber had a way to become legal. It eventually did. The statute changed, but during the three years that it was operating, it was not complying with the law, and the district court held that it was not complying with the law. On the last point that I would like to make is on this issue of the unfair methods of competition. We absolutely argued below that Uber getting cost advantages and pricing advantages made their service was a reason that they violated 93A. We cited the Meritox case, which says that there's no doubt that when one company complies with the law and the other company doesn't comply with the law, that they get unfair advantages. That's precisely the argument that we made below. There was absolutely no waiver of any claim for unfair methods of competition. Our view is that the judge made serious errors of law here on both the unfair competition claim and the 93A claim, and therefore, the judgment should be overturned. I didn't have a lot of time to respond to questions about damages. If any of the judges would like to ask me questions about it, I'd be happy to respond, but otherwise, we rest on the record. Thank you, counsel. We'll take the case under advisement. Thank you, your honor. That concludes the argument in this case. Attorney Blauner and Attorney Dunn, you should disconnect from the hearing at this time.